# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-778


MICHELLE LEWIS

VERSUS

GOLDEN NUGGET LAKE CHARLES, LLC


**\*\*\*\*\*\*\*\*\*\***

ON APPLICATION FOR SUPERVISORY WRIT FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-3773, DIVISION D
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

### D. KENT SAVOIE
### JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of D. Kent Savoie, Van H. Kyzar, Candyce G. Perret, Jonathan W. Perry, and Guy E. Bradberry, Judges.


**WRIT GRANTED AND MADE PEREMPTORY;
SUMMARY JUDGMENT RENDERED.**


PERRET, J., dissents and would deny the writ application.

BRADBERRY, J., would deny the writ.

**M. Paul Skrabanek**
**Pierce Skrabanek, PLLC**
**24 Greenway Plaza, Suite 500**
**Houston, TX 77046**
**(832) 690-7000**
**COUNSEL FOR PLAINTIFF/RESPONDENT**
      **Michelle Lewis**

**Christopher P. Ieyoub**
**Jacinda L. Denison**
**Plauche, Smith & Nieset, LLC**
**1123 Pithon Street**
**Lake Charles, LA 70601**
**(318) 436-0522**
**COUNSEL FOR DEFENDANT/RELATOR:**
      **Golden Nugget Lake Charles, LLC**

**SAVOIE, Judge.**

Defendant-Relator, Golden Nugget Lake Charles, LLC ("Golden Nugget"), seeks supervisory writs from the trial court's denial of its motion for summary judgment. On April 11, 2024, this court issued an order stating, "[i]n keeping with La.Code Civ.P. art. 966(H), we grant this writ for the limited purpose of briefing and oral argument." The order further gave the parties an opportunity to submit additional briefs and request oral argument by certain deadlines stated therein. The parties did not request oral argument or otherwise submit additional briefing by the stated deadlines, so we now consider the merits.

For the reasons that follow, we grant the writ on the merits, make it peremptory, and render summary judgment dismissing Plaintiff's claims against Golden Nugget.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves an alleged slip and fall that occurred on April 24, 2015, at Saltgrass Steakhouse ("Saltgrass") located in the Golden Nugget casino in Lake Charles, Louisiana.

On September 18, 2015, Plaintiff, Michelle Lewis ("Lewis"), filed suit and named Golden Nugget as a Defendant. She alleged in her petition that "[a]s [she] was walking to the restroom, she slipped and fell on a waxy, glossy, slick substance on the floor" and Golden Nugget is liable for her injuries and damages in accordance with La.R.S. 9:2800.6. Golden Nugget filed a motion for summary judgment on July 9, 2019, and the trial court denied it.

On October 2, 2023, Golden Nugget filed a second motion for summary judgment. It argued that there was an absence of factual support establishing the existence of an unreasonably dangerous condition, Golden Nugget's actual or

constructive knowledge of an unreasonably dangerous condition, and/or Golden Nugget's failure to exercise reasonable care. In support of its motion, Golden Nugget submitted Lewis's deposition testimony taken December 23, 2015.

During her deposition, Lewis testified that on the day of the incident, she was eating lunch at Saltgrass between noon and 1:00 p.m. with her sister and father in celebration of her birthday. Lewis explained that they were seated at a table that was located past the entryway of the restaurant, to the left, and approximately the second or third table in front of the bar. Lewis stated that she and her party sat at their table for about thirty minutes to an hour eating lunch and talking and that she did not consume any alcoholic beverages during that time. She testified that after she finished eating, she got up from the table to go to the restroom, which was located outside of Saltgrass, but inside the casino's premises. She said that as she proceeded towards the entryway of the restaurant, she "just slipped." Lewis explained:

> I just -- I lost balance. I don't know what happened. . . I tried to catch myself from falling. So, I tried to put my hands down and that's when the two managers came and asked me was I okay and . . . they helped me. And then . . . he himself even asked if he could look at my shoe you know. They were looking around on the floor. And as I began to get up, I looked and I did see the waxy, glossiness on the floor.

Lewis stated that, at the time of the incident, she was wearing a collared shirt, jeans, and "slide-in sandals" that had wedge heels between three and four inches high. She explained that after she got up after falling, she "still proceeded limping on to the restroom," and then went back to the table with her sister and father after she left the restroom.

Lewis testified that the flooring in the area where she fell was "wooden laminate." She said she did not recall any liquid on the floor in the area where she fell and that she did not notice any wax or liquid of any type on her clothing when

2

she stood up. When asked if there "was any residue or any type of liquid or element that [she] could find on [her] clothes or on the bottom of [her] shoes that indicated there was something on the floor that caused [her] to fall[,]" Lewis responded, "No[.]" Lewis also said that she did not find any kind of substance on the floor that caused her to fall. Lewis's deposition also contains the following:

> Q. Tell me what you felt when you put your hand on the floor as [you were] trying to get up.
>
> . . . .
>
> A. Because I used my hands to help me up. It was kind of like the floor looked glossy and slippery.
>
> Q. And tell me what that felt like on your hand.
>
> A. Just slimy, like soft.
>
> . . . .
>
> Q. Ms. Lewis, when you said you – what you felt on the floor, was it a substance on the floor or was it just the way that your hand moved on that was –
>
> A. The way that my hand moved.
>
> Q. So, was there any residue or . . . anything that you felt in your hands itself that indicated . . . that there was something on the floor?
>
> A. I did not notice that at the time because I was just in shock . . . .
>
> . . . .
>
> Q. Like for example, did you notice if there was any kind of like a wax or something like a liquid or a cleaner that you would have felt on the floor itself as opposed to just the floor being able to have your hand move across? Was there anything that you felt on your hand itself that indicated wax or a liquid or something to that effect?
>
> A. I guess being slippery. Because honestly, if I could have prevented myself from falling with my hands or without hitting the floor totally, then I probably could have done that. But like I said, because of, I guess

based upon [what] the waitress said[1] as well [as] it being glossy and, you know, she said it's the way they make the floor. So, with my impression, I'm assuming because it's laminate and it's wood that it was probably buffed and overwaxed maybe.

. . . .

Q. . . . Did you find any wax or any kind of thing to indicate that it had been overwaxed on your clothing at any point in time?

A. I cannot recall if I did. I cannot.

Lewis also testified that after she went to the restroom, she returned to the table inside of Saltgrass "more than likely" utilizing the same path as when she left to go the restroom, and that she did not have any problems walking on the floor. She also stated that she did not have any problems walking on the floor when she initially walked to the table when her party was seated, or when she and her party left the restaurant after paying their bill. Lewis also said she did not notice anyone else having problems walking on the floor in the area where she fell.

In opposition to Golden Nugget's motion, Lewis relied upon her own deposition testimony and also submitted the January 8, 2020 deposition of Jon Ramirez ("Ramirez"). Ramirez was the general manager of Saltgrass at the time of the incident. Ramirez testified that Lewis fell:

> [R]ight next to where the wine case and the carpet[,] kind of where that threshold is . . . she was exiting the building, she was heading back out to the casino. . . . As she was stepping from the carpet onto the wood, I can't speak to any certainty if it was right there, she took another step, but that's were we noticed her falling and everybody kind of called to attention in that area.

Ramirez testified that after the incident, he remembered "taking note of the area, taking note of the conditions of the area, things like that, just to make sure . . .

---

[1] Lewis testified in her deposition that a waitress told her sister and father that she saw Lewis fall and that the waitress said, "That's the way the floors are made." However, there is no testimony in the record from any waitress, Lewis's father, or Lewis's sister.

you know the first thing you look at is could we have prevented anything as a business." When asked by Lewis's counsel about his personal observations of the area where Lewis says she fell, Ramirez stated, "everything looked to be normal, dry, clean, free of debris, nothing that stood out." He also explained that the floor was made of real wood, it was "brand new," and had "a good finish on [it]. It was nice."

Ramirez was also questioned by Golden Nugget's counsel regarding his personal observations of the floor at the time of incident. Ramierz said that when he inspected the floor both prior to the incident in accordance with a checklist, as well as after the incident, the floor was clean and dry, and "[t]he condition of the area was consistent with the normal condition of the area." Ramirez also indicated that he did not see anything that he thought was a hazardous or dangerous condition.

With respect to the flooring inside of Saltgrass, Ramirez testified that there was wooden flooring in the entryway and bar area of the restaurant, as well as carpet in some areas. He explained that Saltgrass's employees would dust and damp-mop to clean the wooden area of the floor inside the restaurant. He also explained that either Golden Nugget's employees or third-party contractors, rather than Saltgrass's employees, would come in overnight and clean the wood floors at the entryway. When asked whether either Golden Nugget and/or the third-party contractors buffed or waxed the wood floor in the Saltgrass entryway, Ramirez stated, "I don't believe so because of the material, there's special care that has to go into it. Primarily it's dusting and . . . some kind of just damp mop to get everything off." He also said that he did not personally observe anyone doing the overnight cleaning.

Ramirez also said that he believed the flooring outside of Saltgrass was "some kind of Travertine material as well as carpet there in the center." He said he had

5

seen Golden Nugget's employees and/or contractors cleaning that area using "a large carpet cleaner or . . . some kind of cleaning for the stone[,]" but he did not know exactly what was used. He described the cleaning equipment as "large" and what "appeared to be a large buffing system," but indicated that he was uncertain as to what exactly was used because he did not "know that profession." He also explained that when he saw the floors outside of Saltgrass being cleaned, he saw wooden signs saying "caution" placed in the area, and he said that the signs were removed when the work was finished.

Ramierz's deposition also contains the following colloquy with Lewis's counsel:

> Q. Let's just assume for a second that Ms. Lewis is right, that it had been buffed or it had been waxed beforehand, that could present a dangerous condition. Right?
>
> MR. IEYOUB: Object to form.
>
> Q. (By Mr. Skrabanek) You can answer.
>
> . . . .
>
> A. Okay. If it had just been waxed, possibly, but I would assume, and this is just my personal opinion on the matter, that if we're cleaning and buffing a floor that we make sure that it's walkable since we are in a high traffic area.
>
> Q. Well, you all wouldn't have been buffing the floor in the first place. Right? You only use damp mop and a broom?
>
> A. Correct. Dust mop and damp mop.

Ramierz also made clear that he never saw the wood floors inside of Saltgrass being buffed or waxed, and he suggested that given the size of the buffing machine and location of the wooden flooring inside of Saltgrass, he was not certain the floor had been buffed. He also indicated that only Golden Nugget would know if its

6

employees and/or third-party contractors had buffed the area of the Saltgrass floor at issue.[2]  Ramierz's deposition also contains the following:

> Q.  And to the extent that Ms. Lewis is to be believed, had they buffed the area and had there been some kind of waxy sheen or slippery sheen, that can present a dangerous slip-and-fall condition of which they should warn people, even you even?
>
> MR. IEYOUB:  Object to form.
>
> THE WITNESS:  Yes.
>
> MR. IEYOUB:  You can answer.
>
> THE WITNESS:  Yeah.  So, yes, if a hazard had presented itself we would probably be warned.
>
> Q. (By Mr. Skrabanek) Would the only way a waxy sheen or floor wax get on that floor would be for someone like the Golden Nugget or its contractors to have buffed that floor?  You don't have like random customers coming through there dumping floor wax on there, do you?
>
> A.  No, we do not.
>
> Q. . . . [W]ell, assume I believe Ms. Lewis for a second that it was waxy and it had a sheen on it and it was slippery, well, I don't know where that came from, but you would say my best estimate at that point would be that it came from someone buffing the floors from Golden Nugget.
>
> MR. IEYOUB: Object to the form.
>
> You can answer.
>
> Q. (By Mr. Skrabanek) If it was there?
>
> A.  Yes, that would be my best assumption.

Ultimately, the trial court denied Golden Nugget's motion, and Golden Nugget filed an application for supervisory writs with this court.  Therein, it asserted the following assignments of error:

> 1. The District Court erred in finding a genuine issue of material fact existed as to whether a hazardous condition was present which presented an unreasonable risk of harm to Plaintiff, where Plaintiff

---

[2] There is no testimony from any Golden Nugget employee or contractor in the record.

produced no evidence in support of this essential element of her claim other than mere speculation, conclusory allegations, and self-serving statements.

2. The District Court erred in denying Golden Nugget's motion for summary judgment, because Plaintiff did not meet her burden under La.[Code Civ.P. art.] 966(C)(2) to produce factual support sufficient to establish that she will be able to satisfy her evidentiary burden of proof at trial.

## ANALYSIS

When an appellate court reviews a district court judgment on a motion for summary judgment, it applies the *de novo* standard of review, "using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, i.e., whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law." *Supreme Serv. & Specialty Co., Inc. v. Sonny Greer*, 06-1827, p. 4 (La. 5/22/07), 958 So.2d 634, 638.

*Gray v. Am. Nat'l. Prop. & Cas. Co.*, 07-1670, p. 6 (La. 2/26/08), 977 So.2d 839, 844.

"[A] motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

La.Code Civ.P. art. 966(D)(1).

It is well-settled that a plaintiff opposing summary judgment cannot rest on the mere allegations of her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B); *Darr v. Marine Electronics Solutions, Inc.*, 11-908, p. 9

8

(La.App. 5 Cir. 5/22/12), 96 So.3d 527, 533, *writ denied*, 12-1442 (La. 10/8/12), 98 So.3d 860; *Peralta v. Perazzo*, 06-343, p. 6 (La.App. 5 Cir. 10/31/06), 942 So.2d 64, 68, *writ denied*, 06-3028 (La. 2/16/07), 949 So.2d 415. Mere conclusory allegations and unsupported speculation will not support the finding of a genuine issue of material fact; such allegations and speculation are insufficient to satisfy the opponent's burden of proof. *Sears v. Home Depot, USA, Inc.*, 06-201, p. 12 (La.App. 4 Cir. 10/18/06), 943 So.2d 1219, 1228, *writ denied*, 06-2747 (La. 1/26/07), 948 So.2d 168.

*Trench v. Winn-Dixie Montgomery*, *LLC*, 14-152, p. 8 (La.App. 5 Cir. 9/24/14), 150 So.3d 472, 476.

This case involves Lewis's claims for merchant liability under La.R.S. 9:2800.6 as a result of her alleged slip and fall:

> In order to prove merchant liability in a slip and fall case, the plaintiff must prove, in addition to the usual negligence requirements (duty, breach, cause in fact, and damages), those elements found in La.R.S. 9:2800.6(B):
>
> (1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
>
> (2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
>
> (3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

*Dotson v. Brookshire Grocery Co.*, 04-83, pp. 1–2 (La.App. 3 Cir. 5/12/04), 872 So.2d 1283, 1285.

"Because a plaintiff must prove each of these elements, the failure to prove any element is fatal to the claimant's cause of action." *Trench*, 150 So.3d at 476. "Although the owner of a commercial establishment has an affirmative duty to keep the premises in a safe condition, he is not the insurer of the safety of his patrons. A store owner is not liable every time an accident happens." *Id.* (citation omitted).

Golden Nugget argues that summary judgment dismissal is required because there is an absence of factual support establishing the existence of a hazardous condition that presented an unreasonable risk of harm. Golden Nugget asserts that while Lewis said the floor was shiny and speculated that the floor was slippery due to it being buffed with wax, there is no factual support for her conclusion. It argues that the mere existence of a shiny floor, without additional evidence of an unreasonably dangerous condition, is insufficient to establish liability under La.R.S. 9:2800.6.

Golden Nugget also argues that, contrary to Lewis's representation of Ramierz's testimony to the trial court, Ramierz did not testify that a hazardous condition actually existed. Instead, as Golden Nugget suggests, the only appropriate inference that can be drawn from Ramierz's responses to questions that required assumptions and speculation is that *if* Golden Nugget had actually buffed the area at issue, and *if* that caused the floor to be slippery, then that *could be* an unreasonably dangerous condition.

Golden Nugget cites to *Trench*, 150 So.3d 472, *Kinchen v. J.C. Penney Co., Inc.*, 426 So.2d 681 (La.App. 1 Cir. 1982), *writ denied*, 431 So.2d 774 (La.1983), and *Burnett v. Lucky Nails, LLC*, 14-1577 (La.App. 1 Cir. 6/5/15) (unpublished opinion), in support of its argument that summary judgment dismissal is appropriate.

In *Trench*, 150 So.3d 472, the plaintiff fell while walking in the meat department area of a grocery store. In affirming the trial court's summary judgment dismissal of the plaintiff's claims under La.R.S. 9:2800.6, the court stated:

> Winn–Dixie submitted the deposition of Ms. Trench [the plaintiff], in which she testified that it was slippery in the area where she fell, but she admitted that she does not know why it was slippery or what caused her to fall. Although she claims that a manager said the floor had just been waxed and they had put too much wax on the floor, it is undisputed

10

that no one saw anything on the floor that could have caused Ms. Trench to slip and fall, including any excess wax or wax buildup. We note that the surveillance video of the incident shows that the floor was shiny, but it does not show that the condition of the floor presented an unreasonable risk of harm or that any other customer had a problem walking on the floor before or after the incident.

. . . .

In opposition to Winn–Dixie's motion for summary judgment, Ms. Trench failed to provide any factual support for her claim that the condition of the floor presented an unreasonable and foreseeable risk of harm. Rather, she merely speculated that she slipped due to wax on the floor. Ms. Trench admitted that she did not know what she fell on. She claims that the manager of Winn–Dixie said there was too much wax on the floor, which he denies. Regardless, even if the manager stated that the floor had just been waxed and speculated that wax could have caused her fall, there is no evidence that anyone actually saw any wax buildup or any other foreign substance was on the floor. Ms. Trench's factually unsupported and speculative allegation of too much wax on the floor is insufficient to defeat summary judgment.

*Trench*, 150 So.3d at 476–77.

*Kinchen*, 426 So.2d 681, also cited by Golden Nugget, involved a plaintiff who allegedly fell in a department store. The appellate court reversed the trial court's judgment in favor of the plaintiff and found that the plaintiff failed to sufficiently prove either the existence of the alleged premises hazard (water on the floor), or that the polished tile floor was unreasonably slippery. The court stated, "The mere fact that a floor has a 'high shine' is not sufficient to establish liability on the part of the storekeeper. The plaintiff must prove the floor is in fact unreasonably slippery, perhaps as a result of an excessive or uneven application of wax or from the application of an improper wax." *Id.* at 683–84 (citation omitted)." "The fact of the fall alone does not establish the floor was so slippery as to make it unreasonably dangerous." *Id.* at 684.

Golden Nugget also cites to *Burnett*, 14-1577, where the court affirmed the trial court's summary judgment dismissal of plaintiff's claims involving an alleged

slip and fall at a nail salon, finding that the plaintiff's speculative and unsupported allegations were insufficient to defeat summary judgment. The *Burnett* court noted that there was no evidence establishing the presence of any hazardous substance on the floor, and that, "while plaintiff, who was wearing 3 and 7/8–inch heels at the time of her slip and fall, testified that on this particular day, the floor 'felt slippery,' she acknowledged that she did not notice anything unusual about the floor." *Id.* at p. 3. The *Burnett* court further stated:

> In her deposition, plaintiff testified that she felt the floor as she got up after the fall and that it was "slippery" and "felt differently," "like wax." However, she acknowledged that she did not know what made the floor slippery. She speculated that the floor may have been slippery from whatever substance the employees used to clean the floor or wipe their work areas after pedicures. Other than when she placed her hand on the floor to get herself up, plaintiff did not rub the floor with her hands or feet to inspect it. Other than her own speculation, plaintiff did not offer any factual evidence to establish that excessive wax or a cleaning solution was present on the floor that day.

*Id.*

In opposition to Golden Nugget's writ application, Lewis argues that she satisfied the first prong of La.R.S. 9:2800.6 because she "slipped and fell on [Golden Nugget's] waxy floor, which presented an unreasonable risk of harm to Plaintiff and that risk of harm was reasonably foreseeable." She further argues that Golden Nugget had knowledge of the floor's condition because it was the only entity that controlled the cleaning and buffing of the floor and also that Golden Nugget had a "history of failing to leave after cleaning, warning signs about slippery floors."

Lewis also suggests that this case is analogous to *Choyce v. Sisters of Incarnate Word*, 25,958 (La.App. 2 Cir. 8/19/94), 642 So.2d 287, *writ denied*, 94-2510 (La. 12/9/94), 647 So.2d 1119, because, according to Lewis, "the area where the fall occurred was a high-traffic area with the floor that was slippery due to it

12

being highly waxed or buffed to the extent that it was slippery without visible foreign substance on it."

In *Choyce*, 642 So.2d. 287, the plaintiff slipped and fell as she was walking along the main hallway of a medical facility toward the elevators. The trial court rendered judgment in favor of the plaintiff, finding "that the floor 'was highly waxed or buffed to the extent that it was slippery[,]'" and concluding,

> [t]he testimony is diverse as to exactly how the floor is maintained, . . . the preponderance of the evidence supports the conclusion that some type of wax or cleaner is sprayed on the floor after which it is buffed and polished to a bright shine. The testimony is consistent from all of the witnesses that a tile floor such as the one on which Mrs. Choyce [the plaintiff] fell, becomes slick or slippery when repetitively buffed or waxed.

*Id.* at 289. After reviewing the conflicting testimony in the record and noting the credibility determinations made by the trial court, the appellate court affirmed the trial court's judgment. It concluded that the plaintiff sufficiently established the existence of an unreasonably slippery condition "by showing that the floor was of a type that becomes unreasonably slippery if repeatedly waxed and buffed and that this was how the floor was maintained, not by showing that the floor was waxed and buffed to a bright shine." *Id.* at 290.

We agree with Golden Nugget that summary judgment dismissal of Lewis's claims is required given the absence of evidence establishing the existence of an unreasonably dangerous condition. Even though Lewis's petition alleges that "she slipped and fell on a waxy, glossy, slick substance on the floor," her deposition testimony does not support her allegation. While Lewis testified that the floor where she fell *looked* glossy and slippery, she admitted that there was no liquid, cleaner, or other substance on the floor and that she did not notice any waxy substance on either

13

her hands or clothing after she fell. Further, Lewis's *assumption* that because the floor was wood laminate, "it was probably buffed and overwaxed maybe[,]" is an unsupported speculation and does not satisfy her burden or otherwise create an issue of material fact. *Trench*, 150 So.3d 472. The fact that Lewis fell on a floor that appeared shiny, without evidence that there was a substance on the floor or otherwise establishing that the floor was so slippery that it was unreasonably dangerous, is insufficient to satisfy Lewis's burden of proof. *Kinchen*, 426 So.2d 681.

In addition, and contrary to Lewis's characterization of the evidence, there is nothing in the record that establishes the floor in the area where Lewis fell was highly waxed and/or excessively buffed, much less any evidence establishing that it had ever been waxed or buffed by anyone. Therefore, *Choyce*, 642 So.2d. 287, is inapplicable. Instead, Ramirez stated that Saltgrass's employees cleaned the floor by dusting and/or damp-mopping, and there is nothing in the record to suggest that the floor was wet from mopping or otherwise. Ramirez suggested that *if* the floor had been waxed or buffed, that would have been done by Golden Nugget's employees and/or contractors; however, there is no evidence in the record establishing that Golden Nugget's employees or contractors *actually* buffed or waxed the floor where Lewis fell. Without evidence establishing the floor had been waxed or buffed, or evidence that it had been waxed or buffed in a way that caused an unreasonably dangerous condition, Lewis cannot satisfy her burden and summary judgment dismissal is appropriate. *Burnett*, 14-1577.

## **DECREE**

For the foregoing reasons, we hereby grant Golden Nugget's writ application, make it peremptory, and render summary judgment in favor of Golden Nugget,

14

dismissing Lewis's claims against it. Costs of this proceeding are assessed to Plaintiff-Respondent, Michelle Lewis.

**WRIT GRANTED AND MADE PEREMPTORY; SUMMARY JUDGMENT RENDERED.**